# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| BRUCE ERIC STITELER[1] ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 16-cv-259-JPG-CJP |
| ) | |
| NANCY A. BERRYHILL, ) | |
| Acting Commissioner of Social Security, ) | |
| ) | |
| Defendant.[2] ) | |

## MEMORANDUM and ORDER

In accordance with 42 U.S.C. § 405(g), plaintiff Bruce Eric Stiteler, represented by counsel, seeks judicial review of the final agency decision denying his application for Supplemental Security Income (SSI) pursuant to 42 U.S.C. § 423.

## Procedural History

Mr. Stiteler applied for supplemental security income on February 1, 2012, alleging disability beginning on November 1, 2011. (Tr. 13). After holding an evidentiary hearing, Administrative Law Judge (ALJ) Robert G. O'Blennis denied the application on September 25, 2014. (Tr. 13-20). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1. The ALJ committed reversible error by giving no weight to the opinion of the treating physician contrary to 20 C.F.R. § 404.1527(c); ruling 96-2p; ruling 96-5p and rejected the opinions of plaintiff's primary medical providers.

---

[1] Incorrectly identified as Bruce R. Stiteler in pleadings and on docket.
[2] Nancy A. Berryhill is now the Acting Commissioner of Social Security. See, *Casey v. Berryhill*, 853 F.3d 322 (7th Cir. 2017). She is automatically substituted as defendant in this case. See Fed. R. Civ. P. 25(d); 42 U.S.C. §405(g).

2. The ALJ committed reversible error as his assessment of residual functional capacity lacks adequate support in the record.

3. The credibility determination was erroneous and was expressed in "boilerplate language" as a template throughout the decision, contrary to holdings of the Seventh Circuit Court of Appeals.

4. The ALJ committed reversible error when he improperly relied on the deficient testimony of the vocational expert.

## **Applicable Legal Standards**

To qualify for SSI, a claimant must be disabled within the meaning of the applicable statutes.[3] For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. § 423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

---

[3] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, et seq., and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, et seq., and 20 C.F.R. pt. 416. As is relevant to this case, the DIB and SSI statutes are identical. Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a duration requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Weatherbee v. Astrue*, 649 F.3d 565, 568-569 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. 20 C.F.R. § 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-513 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984). *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001)(Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a

claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether Mr. Stiteler was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. See, *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)). This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997); *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### The Decision of the ALJ

ALJ O'Blennis followed the five-step analytical framework described above. He determined that Mr. Stiteler had not been engaged in substantial gainful activity since the alleged onset date. (Tr. 15). He also found that plaintiff had the following severe impairments: peripheral artery disease, COPD, osteoarthritis of the lumbar spine, and a remote history of spinal fusion.

*Id.*

The ALJ concluded that Mr. Stiteler had the residual functional capacity (RFC) to perform light work except that he should avoid operating foot controls with the lower extremities; that he could occasionally climb ramps and stairs but he must avoid climbing ladders, ropes, and scaffolds; that he must also avoid exposure to dangerous heights and moving machinery; that he could occasionally stoop, kneel, crouch, and crawl; that he must avoid concentrated exposure to heat and cold, noxious fumes, odors, dusts, and gases as well as ambulating on unimproved terrain such as open fields, plowed fields, and construction sites; and that he should avoid work that involves exposure to whole body vibration such as operating heavy equipment, off road driving, and operating over-the-road trucks. *Id.* The ALJ also found that plaintiff had no past relevant work and he was not disabled because jobs existed in significant numbers in the national economy that plaintiff could perform. (Tr. 19-20).

### **The Evidentiary Record**

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

1. **Agency Forms.**

Plaintiff was born in 1960 and was fifty-one years old on the alleged onset date. (Tr. 134). Plaintiff claimed he was unable to work due to back problems and peripheral artery disease ("PAD"). (Tr. 138). Before the alleged onset date, plaintiff was a construction worker, as well as an installer for a construction company and a cable company. (Tr. 139). Plaintiff stated he could not walk more than a few steps, could not bend or lift anything, and was forced to sit or lie down constantly. (Tr. 148). He further alleged that his pain limited his ability to think and sleep. *Id.*

### 2. Evidentiary Hearing.

Mr. Stiteler was represented by an attorney at the evidentiary hearing on February 25, 2014. (Tr. 26). At the time of the hearing, plaintiff was fifty-three years old and lived with another adult. (Tr. 28). Plaintiff did not drive because he lost his license in 2003 after receiving a DUI. (Tr. 29). However, he was eligible to get his license back upon completion of a program. *Id.* He also did not drive because he lost feeling in his feet. *Id.* Plaintiff graduated from the twelfth grade and did not continue his education. *Id.*

Plaintiff testified he became disabled in November of 2011, when he discovered he had PAD. *Id.* Plaintiff received medical attention for his PAD, which helped with pain, but he was still unable to feel his feet. (Tr. 30). Plaintiff also received two steel rods in his back in 1989 and was initially told he would never walk again. *Id.* However, he completed therapy and was able to walk after one year. *Id.*

Plaintiff did not use special shoes or stockings to help with his feet. (Tr. 30-31). He did not want to try to use a gas pedal or a brake because he would be unable to tell what he was doing. (Tr. 30). He believed he could use hand controls, but did not "see the need." *Id.*

Merely moving could cause plaintiff to become light-headed, so he would use a cane or crutch. *Id.* His doctors opined that the light-headedness was a possible side effect of his medication. *Id.* He did not know what medication he was taking. *Id.* Plaintiff then handed his medications to his attorney, who presented them to the ALJ. (Tr. 31-32). The ALJ noted that the medication included hydrochlorothiazide, which plaintiff took once per day, as well as amitriptyline HCL, which plaintiff took twice per day. *Id.* Plaintiff explained the pills were for pain in the back of his arms. (Tr. 32). Plaintiff's doctor was Dr. Shaffer, who plaintiff had seen

for approximately one year. (Tr. 33). Plaintiff did not take any other medication. *Id.*

Plaintiff did not exercise. *Id.* He usually was awake by 7:00 a.m. and tried to go to bed around 9:00 p.m.. *Id.* He spent his days watching a lot of television and did not leave his home very often, except to go to the store. *Id.* He did not visit friends or relatives – they would visit plaintiff in his home. *Id.* He did not have any relatives in the area. (Tr. 34). Plaintiff's hobbies included woodworking and eating. (Tr. 34). He did not have any trouble taking care of his personal needs. *Id.* Plaintiff was not a member of a social group, but he did play chess and monopoly. (Tr. 34-35).

Plaintiff could lift, at most, a ten pound bag of potatoes, although that could put him "in a glitch." (Tr. 35). Lifting anything heavier caused him pain. *Id.* Plaintiff's doctor did not know what caused this pain and plaintiff did not want any "heavy" medicine like Vicodin because it turned him "stupid." *Id.* Plaintiff did not take Tylenol or other over-the-counter medicines. *Id.* Plaintiff could stand for approximately twenty minutes, at most, and sit for about fifteen to twenty minutes. (Tr. 36). Plaintiff's doctor recommended he get an inhaler, but plaintiff never did. *Id.* Plaintiff had never undergone a pulmonary function test. *Id.*

Plaintiff did not do any yardwork. (Tr. 37). He did not have any pain in his feet, but did have pain in his knees from being old. *Id.* He had worn a back brace at all times for the past ten years. *Id.* The hydrochlorothiazide caused plaintiff to use the bathroom every hour, including during the night. (Tr. 38). Thus, he never slept a full night. *Id.* Plaintiff's pain also contributed to his inability to sleep. *Id.* Consequentially, plaintiff took naps from noon until approximately 3:00 p.m. *Id.* He frequently altered his posture from sitting to standing to lying down throughout the day. *Id.* He was forced to be in a reclined position to accommodate physical discomfort for approximately three hours per day. (Tr. 39). He also occasionally nodded off for a few minutes.

*Id.*

Plaintiff was previously self-employed and "did Windows and siding and doors" in Ohio. *Id.* However, he could not lift anything. *Id.* He worked from the time he was eighteen years old until he was twenty-nine. *Id.* Plaintiff had not worked for the past ten years. (Tr. 40). He survived, financially, by making things for friends and living with them. *Id.* For instance, he would make table holders, chairs, and benches. *Id.* Plaintiff also installed cable television in 2000 and 2002. (Tr. 41).

Mr. Bob Hammond, a vocational consultant on contract with the Social Security Administration, also testified at the hearing. (Tr. 42). Mr. Hammond considered a hypothetical individual whose RFC corresponded to plaintiff's ultimate RFC findings. (Tr. 42-43). Mr. Hammond opined that such an individual could perform light positions, for instance, as an assembler or an injection molder. (Tr. 42).

If this same individual had to consistently miss more than two days of work per month, this would preclude competitive employment at these jobs. (Tr. 44). Similarly, if that same person could appear for work every day, but at least once per week appeared late to work, left early, or stepped away, this would preclude competitive employment. *Id.* If plaintiff, due to sleep deprivation and/or necessity to use the bathroom, was off task approximately twenty percent or more of the time, all positions at all levels would be eliminated. (Tr. 45).

    **3.**    **Medical Records.**

On November 17, 2011, plaintiff presented to Memorial Hospital alleging pain in his right leg, ankle, and foot after taking twenty steps. (Tr. 209). A physician noted plaintiff had an antalgic gait and tenderness in his calf. (Tr. 209-10). Plaintiff was diagnosed with aortoiliac occlusion, bilateral superficial femoral artery and infrapopliteal occlusive disease with moderate

to severe distal ischemia, and likely ischemic rest pain. (Tr. 223).

On November 25, 2011, a preoperative radiology report of plaintiff's chest showed a chronic plueroparenchymal scarring in the left lung, pleural thickening, and a tortous aorta. (Tr. 229). On December 1, 2011, plaintiff underwent an aortogram with runoff and a left brachial approach with intraoperative ultrasound. (Tr. 232). On December 9, 2011, plaintiff complained of numbness and needle-like pain in his right leg which had persisted for longer than two months. (Tr. 298). On December 13, 2011, plaintiff presented to Dr. David Finlay with "BLE rest pain", and Dr. Finlay noted, "bilateral iliac occlusion w/ right calf tiredness/cramping with minimal walking and rest pain." (Tr. 273). On January 6, 2012, plaintiff presented to Belleville Family Health Center with the same pain. (Tr. 295). The physician opined plaintiff would likely require surgical intervention for his PVD and recommended an exercise program, a healthy diet, and smoking cessation. *Id.* On February 8, 2012, plaintiff underwent a remote endarterectomy, bilateral iliofemeroal with balloon angioplasty, stent graft placement in the right common iliac artery, and a fem-fem bypass for his bilateral lower extremity ischemia. (Tr. 248).

On March 26, 2012, plaintiff presented to Belleville Family Health Center with pain in his right foot that he described as "tingling" and "constant". (Tr. 291). His pained worsened upon waking up and going to bed, and with weight bearing activities. *Id.* The physician noted plaintiff's foot was "much improved" since surgery, *Id.*, and recommended that plaintiff apply a warm compress to the affected area and perform range of motion exercises. (Tr. 292). Plaintiff was also referred to occupational therapy, *Id.*, and prescribed nortriptyline. (Tr. 293). On April 12, 2012, plaintiff presented to Dr. Chappa with complaints of back pain, shaky legs, and occasional swelling of his feet. (Tr. 307). He also stated he had difficulty walking, cutting his toenails, sitting for long periods of time, and sleeping. *Id.* When asked to ambulate, plaintiff

supported himself with the wall and furniture. (Tr. 308). The physician was unsure why plaintiff needed support while walking because plaintiff's circulation had significantly improved after surgery. (Tr. 309). Plaintiff's motor strength was 5/5 in both upper and lower extremities. *Id.*

On May 3, 2012, plaintiff told Dr. Henson that he could not prepare meals because he could not stand without getting wobbly. (Tr. 324). Dr. Henson noted that plaintiff appeared credible and his statements about symptoms and limitations were consistent with medical evidence. *Id.* On May 4, 2012, Dr. Gonzalez, a state-agency consultant, reviewed plaintiff's records and opined that plaintiff's statements about his symptoms and limitations were partially credible. (Tr. 331). Plaintiff indicated he had a hard time talking, but Dr. Gonzalez found no medical evidence that corroborated this claim. (Tr. 331). Dr. Gonzalez concluded that plaintiff could occasionally life twenty pounds, frequently lift ten pounds, stand and/or walk for a total of six hours in an eight-hour workday, and push and/or pull for an unlimited time. (Tr. 327). Dr. Gonzalez further opined that plaintiff should avoid concentrated exposure to extreme cold and hazards, such as machinery and heights. (Tr. 330).

On October 31, 2012, plaintiff reported moderate back pain that worsened over time and occurred persistently. (Tr. 371). Bending, changing positions, daily activities, extension, flexion, and lifting aggravated plaintiff's symptoms. *Id.* Ibuprofen and naproxen alleviated the pain. *Id.* Dr. Shaffer referred plaintiff to Dr. Herndon for pain management. *Id.* On February 20, 2013, Dr. Shaffer examined plaintiff and wrote him a letter stating "it would be hard for him to work full time due to inability to feel feet and legs, and his chronic back pain." (Tr. 367). Dr. Shaffer also "mentioned and encouraged part time work is [sic] possible," and explained that "[t]he note was to help him for a 12k fine as he has trouble working to pay the fine." *Id.* Plaintiff told Dr. Shaffer he did not attend his appointment with Dr. Herndon because the amitriptyline was working. *Id.*

On March 12, 2013, plaintiff received a CT scan of his head and cervical spine from St. Elizabeth's Hospital. (Tr. 343-45). The scan showed arthritic changes in the lower cervical spine with mild canal stenosis at C5-6 level and some bilateral foraminal stenosis at C5-6 level. (Tr. 345). There was also mild compression superior endplate of the C7 vertebral body. *Id.* On June 11, 2013, Dr. Shaffer stated that plaintiff complained of shortness of breath after walking several blocks, which was most likely a symptom of undiagnosed moderate to severe COPD. (Tr. 363). Plaintiff was also experiencing back pain. *Id.*

On August 15, 2013, Dr. Shaffer noted that plaintiff's back pain was improving with amitriptyline, that plaintiff had high hypertension, and that plaintiff experienced shortness of breath that was likely undiagnosed COPD. (Tr. 359). On January 30, 2014, Dr. Shaffer stated that plaintiff was benefitting from his amitriptyline. (Tr. 352). However, plaintiff still reported that his low back pain significantly limited his daily activities and ability to commute. *Id.* Dr. Shaffer opined that plaintiff could not work a full time job. *Id.* On February 24, 2014, Dr. Finlay reported an ABI of 1 in plaintiff's right lower extremity and an ABI of .93 in his left lower extremity, consistent with asymptomatic peripheral vascular disease. (Tr. 283). On March 10, 2014, Dr. Shaffer reported plaintiff had improved significantly with an increase in amitriptyline. (Tr. 352). On November 11, 2014, on plaintiff's behalf, Dr. Shaffer completed an application for "Persons with Disabilities Certification for Parking Placard/License Plates". (Tr. 376). Dr. Shaffer verified plaintiff could not walk without assistance and was "severely limited in his ability to walk due to an arthritic, neurological, oncological or orthopedic condition." *Id.*

## Analysis

Plaintiff's overarching argument is that the ALJ erred in not giving enough weight to plaintiff's primary medical provider, Dr. Shaffer, and ultimately committed reversible error in

his assessment of plaintiff's RFC. More specifically, plaintiff argues that the ALJ's RFC findings improperly relied on the state-agency physician, Dr. Gonzalez's, opinion rather than Dr. Shaffer's "more recent and more detailed examinations." Defendant, on the other hand, asserts that this was not an error because state-agency physicians are Social Security disability experts, Dr. Shaffer's opinions were unsupported, and the ALJ was not required to re-contact the state agency-physician to consider evidence submitted after the consultation.

Pursuant to 20 C.F.R. § 404.1527(c), the Social Security Commission generally gives more weight to a medical opinion from the plaintiff's treating source, so long as it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [plaintiff's] case record." The ALJ must offer "good reasons" for not affording the treating physician's opinion controlling weight. *Brown v. Colvin*, 845 F.3d 247, 252 (7th Cir. 2016) (quoting *Larson v. Astrue*, 615 F.3d 744, 749 (7th Cir. 2010)).

The ALJ found that Dr. Shaffer was not credible for the following reasons: In February of 2012, Dr. Shaffer gave plaintiff a letter stating it would be difficult for plaintiff to maintain a full-time job, but Dr. Shaffer also found plaintiff demonstrated a normal range of motion, muscle strength, and stability in all extremities, with no pain on inspection. (Tr. 17). Further, Dr. Shaffer explained that the note was to help plaintiff pay a $12,000 fine. *Id.* In January of 2014, Dr. Shaffer opined plaintiff could not maintain a full-time job due to poorly controlled pain symptoms, but Dr. Shaffer also indicated that plaintiff was benefitting from amitriptyline, exhibited no remarkable findings during the physical examination, and did not use his Albuterol inhaler because his shortness of breath was infrequent. (Tr. 18). The ALJ further discredited Dr. Shaffer based on a report from March of 2014, in which Dr. Shaffer again opined that plaintiff

could not maintain a full-time job, despite an unremarkable physical examination and significant improvement in plaintiff's back pain. *Id.*

The ALJ apparently rejected any possibility that plaintiff could have been both improving, yet still unable to work a full-time job. Additionally, the ALJ assumed that a lack of physical symptoms precludes the existence of pain. Also, that plaintiff may have presented to Dr. Shaffer on occasion without any "pain on inspection" is not indicative of plaintiff's pain on an average day. Thus, these do not constitute "good reasons" for rejecting the treating physician's opinion and the ALJ's interpretation of Dr. Shaffer's records suggests he impermissibly "played doctor by refusing to credit the opinion of [the] treating physician." *Liskowitz v. Astrue*, 559 F.3d 736, 741 (7th Cir. 2009) (internal quotations omitted). Due to the absence of evidence that Dr. Shaffer's opinions substantially contradicted other medical evidence and/or were unsupported, the ALJ should have given them more weight.

Furthermore, 20 C.F.R. § 404.1527(c) also states that the Commissioner "give[s] more weight to the medical opinion of a source who has examined [plaintiff] than to the medical opinion of a medical source who has not examined [plaintiff]." By giving "great" weight to Dr. Gonzalez, (Tr. 18), and virtually no weight to Dr. Shaffer, the ALJ erred in this aspect as well. Dr. Gonzalez based her opinions off of plaintiff's medical records, without actually conducting an examination, (Tr. 327), while Dr. Shaffer had examined and treated plaintiff on numerous occasions, spanning from 2012 through 2014. Also notable, Dr. Gonzalez's report was generated in May of 2012, while Dr. Shaffer's most recent report in the record is dated in November of 2014. (Tr. 376). Medical records throughout this two and a half year period contain relevant information of plaintiff's condition that Dr. Gonzalez, naturally, did not take into account while formulating her opinion regarding plaintiff's RFC.

Defendant correctly points out in her brief that a treating physician's general opinion that a plaintiff was unable to work is not conclusive on the ultimate issue of disability. Rather, this determination is reserved to the Commissioner. While the ALJ was not required to accept Dr. Shaffer's opinion regarding plaintiff's ability to work, he was required (for the foregoing reasons) to give deference to Dr. Shaffer's opinion regarding plaintiff's pain and other symptoms. A review of the record shows the ALJ was improperly "cherry-pick[ing] facts that support[ed] a finding of non-disability while ignoring evidence that point[ed] to a disability finding." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010).

The ALJ highlighted several pieces of evidence that demonstrated plaintiff's condition was improving, but ignored plaintiff's continuous complaints of pain that were documented consistently throughout the medical record. For instance, the ALJ noted that a Belleville Family Health Center report from March of 2012 stated plaintiff was "much improved from surgery." (Tr. 17). The ALJ did not consider, however, that in the same report, plaintiff described constant pain in his foot, which worsened upon waking up, going to bed, and with weight-bearing activities. (Tr. 291). The ALJ then cited to a report from April, 2012 where Dr. Chappa was unsure why plaintiff was using the furniture and walls to support himself while ambulating, because plaintiff's circulation had significantly improved with surgery. (Tr. 17). The ALJ did not note, however, that plaintiff complained of back pain, shaky legs, occasional swelling of his feet, and difficulty walking, cutting his toenails, sitting for long periods of time, and sleeping. (Tr. 307). The ALJ also noted that plaintiff was not using his Albuterol inhaler in January, 2014 because his shortness of breath was infrequent, and that plaintiff's amitriptyline was beneficial. (Tr. 18). The ALJ failed to mention that during this same examination, plaintiff reported that his

low back pain significantly limited his daily activities and ability to commute. (Tr. 352). Furthermore, the ALJ relied on the psychological consultant's statement that plaintiff had no medically determinable mental impairment. (Tr. 18). The ALJ did not mention, though, that the consultant, Dr. Henson, also opined that plaintiff appeared credible and his statements about symptoms and limitations were consistent with medical evidence. (Tr. 331).

      Plaintiff also argues that the ALJ failed to take into account the following line of questioning of the VE that occurred at the hearing: "Q: All right. If we would assume that for some medical reason the hypothetical individual would consistently miss more than two days a month at the jobs, would that preclude competitive employment at any of the jobs after a brief period? A: It would." (Tr. 44). Also, "Q: If the claimant due to sleep deprivation and/or of necessity to use the bathroom were off task away from the work station 20 percent or more of the time, would that impact his ability to do the jobs you identified or other jobs? A: That would eliminate all positions at all levels." (Tr. 45). Plaintiff had previously testified his medication caused him to use the bathroom once per hour and, consequently, he never slept a full night and would often nap throughout the day. (Tr. 38). Although the ALJ did not specifically address these particular side-effects in his opinion, the ALJ did make a credibility determination, noting that "there are few, if any, documented complaints of significant side effects from the medications [plaintiff] does take." (Tr. 19). Credibility determinations are given "considerable deference" and will only be overturned if they are "patently wrong". *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006). In making his credibility determination, the ALJ considered several pieces of evidence, such as the medical records and plaintiff's testimony and "sparse employment history". (Tr. 19). Thus, the determination is not patently wrong and the ALJ will not be overturned on this basis. However, in light of the ALJ's distorted discussion of the

medical record, his determination that Mr. Stiteler was not disabled is unsupported by substantial evidence. In view of the disposition of plaintiff's first two points, it is not necessary to analyze plaintiff's "boilerplate" argument.

Finally, plaintiff asserts the vocational expert relied on "unwarranted assumptions" in concluding there was a sufficient amount of jobs plaintiff could perform. However, plaintiff made no objection to the VE's testimony at the hearing and "[w]here . . . the VE identifies a significant number of jobs the claimant is capable of performing and this testimony is uncontradicted (and is otherwise proper), it is not error for the ALJ to rely on the VE's testimony." *Liskowitz*, 559 F.3d at 745-46.

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Mr. Stiteler is entitled to social security disability benefits. On the contrary, the Court has not formed any opinions in that regard, and leaves that issue to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying Bruce R. Stiteler's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. § 405(g).

The Clerk of Court is **DIRECTED** to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATED:** 5/24/2017

                                           *s/J. Phil Gilbert*
                                           **J. PHIL GILBERT**
                                           **U.S. DISTRICT JUDGE**